459 P.2d 523

William C. ESMEIER, Petitioner,

v.

INDUSTRIAL COMMISSION of Arizona, Respondent,

Paul Clark Ford, Inc., Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 245.

Court of Appeals of Arizona, Division 1.

Department A.

Oct. 7, 1969.

**436**

Westover, Keddie & Choules, by Ted B. Bowen, Yuma, for petitioner.

Michael A. Lasher, Jr., Former Chief Counsel, Donald L. Cross, Chief Counsel, Phoenix, for respondent Industrial Commission of Arizona.

Robert K. Park, Chief Counsel by Arthur B. Parsons, Phoenix, for respondent Carrier State Compensation Fund.

DONOFRIO, Presiding Judge.

This is a writ of certiorari to review the lawfulness of an award and findings of the Industrial Commission issued October 9, 1968, affirming an award and findings for noncompensable claim issued on May 24, 1968.

The petitioner, William C. Esmeier, died July 24, 1967 as the result of a subdural hematoma and brain injury received on March 19, 1967 in the automobile accident which was the basis of his claim for workmen's compensation. Subsequently, the case was prosecuted by his son, William R. Esmeier, as special administrator of his estate.

Decedent was an automobile salesman employed by Paul Clark Ford Sales of Yuma, Arizona. The accident occurred on Sunday, March 19, 1967, at 9:59 p. m., in the 5300 block of Grand Avenue, Glendale, Arizona. Deceased stated he was blinded by oncoming headlights and ran his auto into and under a one-ton truck. He was taken to Maryvale Hospital, Phoenix, Arizona, where he was treated by Dr. George Anderson. He was released and returned to Yuma two weeks following the accident. On the following Monday at his son's suggestion because of his continuing complaints, he went to the office of Dr. William H. Lyle who had him admitted to Parkview Baptist Hospital, Yuma, Arizona. He remained in the hospital until the first or second of May, 1967, when he was transferred to St. Joseph's Hospital in Phoenix. There he was under the observation of Dr. Hal W. Pittman, a neurosurgeon. On April 14, 1967 Dr. Lyle filed a physician's initial report of treatment with the Industrial Commission, indicating a diagnosis of cerebral concussion, laceration of scalp, right temporal area, multiple burns and contusions, sprain of cervical, dorsal and lumbar spine. He listed as decedent's complaints that he was unable to think clearly, suffered from dizziness, headaches, numbness of legs and arms, and pain in the spine.

The petitioner was interviewed by an Industrial Commission investigator who filed a memorandum with the Commission dated April 26, 1967. In it he indicates that he had contacted the decedent in the Parkview Baptist Hospital, and that he had made the following statement:

"* * * he had delivered a car to Mesa, and was on his way to show the car he was driving to a customer in or near the Glendale area, when he became blinded by oncoming headlights, went off the road and into a parked truck."

The report further recites:

"Main injuries to the claimant are to his shoulders, neck, back and head. Claimant was unable to provide the name of the party in the Glendale area, where he was going to make a demonstration. Claimant stated that since the accident his memory has not been good, and that he suffers dizzy spells at times."

On May 4, 1967 the Legal Department memorandum again referred this case to Investigation with a request that the claimant make further effort to provide the name and address of the potential customer in Glendale. Further, that once the name and address were obtained, the potential customer should be interviewed to verify the facts. The memorandum continues,

"Otherwise we are left with the fact that the claimant has made an unexplained detour. I find it difficult to understand, difficult to believe that a Yuma agency would be sending cars to Glendale residence (sic) as a usual course of business."

An investigation report appears in the file dated May 17, 1967. The report states that the investigator, Dixie Johnson, contacted the employer's business manager, George Foye, who stated that "the car salesmen are on their own and claimant would be the only one who could give the name or address of the potential customer. A salesman gets a lead and dashes off." Also, the report stated that the investigator had contacted the claimant who stated that he had delivered a car in Mesa and was on his return trip home, and that he proceeded to call on Lilly Lawler who lives one-half block off Van Buren on 20th Street. She was not at home, but she was interested in a car about the type he was driving. Since she was not home, he wanted to eat at the Range Restaurant in Glendale, and then was going to call on a customer in Tolleson. He could not remember the name, but the man was the manager or owner of the Tolleson Pharmacy. This report also stated that the

claimant complained that he was still having trouble remembering.

The following memorandum appears in the Commission file under date of June 9, 1967:

"To: Cuca Culling, Acceptance Supervisor

From: Louis C. Haggerty, Legal Department

"Recommend denial of the claim based upon a finding that the claimant did not sustain injury by accident arising out of and in the course of his employment.

"The history of events, as given by the claimant, appears vague and shifting and difficult of belief. But even if he did come up from Yuma on business, it would appear that he was on a wide detour."

It is to be noted that five days following the date of this memorandum the claimant underwent brain surgery of three hours' duration for the removal of the subdural hematoma which was causing his vagueness and speech difficulty.

On June 14, 1967, the same day that the claimant was undergoing brain surgery, the Commission issued its findings and award for noncompensable claim, a printed form which in Finding No. 4 finds that the applicant did not sustain an accident arising out of and in the course of his employment.

An electroencephalographic report made at the Barrow Neurological Institute of St. Joseph's Hospital on June 21, 1967 concludes with this paragraph:

"IMPRESSION: The awake and sleep EEG is moderately abnormal with poor background development in suppression of amplitude over the entire left hemisphere most marked in the anterior head region. These changes suggest diffuse involvement of the central nervous system most prominent in the left hemisphere with possible focal changes maximal in the left interior head region but

the findings should be correlated with the clinical history to be of significance. * * *"

The record is sketchy as to what date the petitioner was discharged from Barrow Neurological Institute, and on what date he was readmitted to Parkview Baptist Hospital in Yuma, Arizona. However, Dr. Dale F. Webb, who testified, indicated that he had seen the decedent in the Yuma hospital in the first week in July, possibly July 4th or 5th. Decedent remained hospitalized there until his death on the 24th of July.

All the medical evidence in the record before the Commission indicated that following the accident the petitioner's mental condition deteriorated, as did his actual physical ability to communicate his thoughts. Dr. Webb testified with regard to the period after July 4 or 5, 1967 while he was treating the decedent,

"Q At that time, to the best of your knowledge, what was the condition of the patient?

"A Well, he was a very poor historian, he was unable to remember, he had aphasia, he had lost the ability to say something. He would tell you he knew what he was wanting to say, but was unable to communicate very well, which to me indicated that he had rather a serious head injury, and through Dr. Lyle it was substantiated this had not been present prior to his injury. He was unable to tell me a great deal, most of what I obtained was from Dr. Lyle, that he had a head injury, had undergone surgery and treatment for the head injury and had been hospitalized almost continuously since the injury."

Also,

"MR. SHADLE: Q Was there a noticeable deterioration in the patient's memory from the time you first saw him until the time he passed away?

"A Yes, this is a problem that we were trying to decide whether or not there had been a recurrence of the subdural hematoma. Occasionally there will be fluid collect in the area where the clot was removed, and he was beginning to deteriorate to the point where we thought that had occurred, and we wanted to know whether surgery was going to be needed. But he showed no definite evidence, and at the time we could not transfer him from the hospital, but he did just gradually deteriorate.

* * * * * *

"Q Based upon your observations only and your treatment of the patient during the time you treated him, can you give the Referee an opinion as to what loss of memory or loss of fluency the patient might have had in March, several months prior to the time you first saw him?

* * * * * *

"THE WITNESS: Someone who has severe enough injury to the skull to create a subdural hematoma, an acute one, the mortality rate is approximately 80 per cent on this because of the severe injury to the brain, and to say that he would have anything but a disoriented brain would be presumptuous, that the man who has an acute subdural hematoma you could say was very little doubt that he would have a considerable amount of difficulty going about his ordinary way of life, because there is about an 80 per cent mortality with this particular type of injury, an acute subdural hematoma."

It is apparent from the medical record that the decedent, because of his accident, was not mentally capable of assisting in the preparation of his industrial compensation claim, even though he lived for several months following the accident. The attorneys who represented him were employed one or two days prior to decedent's death, and at no time had an opportunity to interview him although, as has been indicated by the medical evidence, it is doubtful that even skillful interviewing by an attorney would have elicited rational and coherent information from the decedent in his debilitated condition.

■ Our Supreme Court has stated:

"The Workmen's Compensation Law was not intended to provide benefits only to those dependent survivors of deceased workmen who had the dubious good fortune to be killed on the job in the presence of witnesses. Where no witnesses are present circumstantial evidence can be introduced to prove the existence of the accidental occurrence arising out of the employment." Southwest Forest Industries, Inc. v. Industrial Commission, 96 Ariz. 91, 93, 94, 392 P.2d 506 (1964).

A logical extension of this statement of the law, applied to the instant case, is that the Workmen's Compensation Law was not intended to provide accident benefits and compensation only to an injured workman who retains sufficient mental capacity after a horrendous injury to the brain to competently assist in preparing his claim where no witnesses were present. In such a situation, circumstantial evidence can be introduced to show that the workman suffered an accidental injury arising out of and in the course and scope of his employment. The burden of proof remains the same even though it falls upon the personal representative of the incompetent workman, and that burden is that all of the facts necessary to substantiate the claim must be proved by a preponderance of the evidence.

■ It is the function of the Court of Appeals when petitioned to review Industrial Commission awards to determine whether the evidence before the Commission reasonably supports its decision and not to try the case anew. Andreason v. Industrial Commission, 6 Ariz.App. 434, 433 P.2d 287 (1967). Using this guide, we turn to the evidence that was introduced to determine whether or not it supports the Commission's finding that the petitioner did not suffer an accident arising out of and in the course and scope of his employment.

An investigator for the Industrial Commission filed a report dated September 20, 1967, in which he summarizes interviews with three persons; namely, Mr. George Foye, business manager for Paul Clark Ford, Inc. of Yuma, Arizona, Lilly Lawler of Phoenix, Arizona, and Mr. James Rowe, owner of the Tolleson Pharmacy, Tolleson, Arizona. Mr. Foye told the investigator that the decedent had sold a car in Mesa which he delivered just prior to the date of the accident. After that, he said a defect was noted in the windshield, and the decedent returned to Mesa to rectify that complaint with the purchaser. Mrs. Lawler stated she had discussed the purchase of an automobile with decedent approximately two years prior to the interview, and had seen him subsequent to this. She stated she did not have any dealings with the decedent at the time of the accident. (It is to be noted that Mrs. Lawler's testimony coincides with that given by the decedent, to the effect that he had made an attempt to call on her, but did not find her at home.) Mr. Rowe told the investigator that he had seen decedent at the end of January and had told him that he was not in the market for a car at that time. Subsequently, he saw the decedent on the first of April when he stopped to have a prescription filled before returning to Yuma following the accident. He stated that the claimant "knew people around the state and was the type of salesman that would pursue his friends in an attempt to make a sale." Mr. Rowe's statement also bears out the story told by decedent to the effect that he had hoped to make a stop in Tolleson to demonstrate the used car he was driving.

A formal hearing was held September 21, 1967 at Yuma. Paul Clark, the owner of Paul Clark Ford, Inc., testified that in his dealership salesmen ordinarily had a new car as a demonstrator. He was asked and answered,

"Q So when a salesman is driving a used car, it's probably for the purpose of showing that particular car rather than as a fringe benefit?

"A Normally speaking this would be true, yes.

"Q Now, was Mr. Esmeier making sales of automobiles other than in the Yuma area, if you know?

"A Yes, I think he sold cars outside of the City of Yuma.

Also,

"Q Would it be reasonable to state the metropolitan area of Phoenix would be a reasonable distance for him to go?

"A It would not be a reasonable distance, but it would not be an exceptional distance if he had a particular person to see in that area. In other words, it would be exceptional for us to sell a car in Phoenix because it's 185 miles and we normally do not go this far to sell an automobile, but it has happened in the past and it will happen in the future that we will do this. I'm trying to answer the question as best I can."

On cross-examination, Mr. Clark testified:

"Q Mr. Clark, is this the form of sale that was involved that caused Mr. Esmeier to go to Mesa on March 19, do you know?

"A As I understand it, this was in connection with the delivery of this automobile, the car had been previously delivered, there was a problem with the car and Mr. Esmeier was going back to talk with the customer.

"Q Now, did you, yourself, have anything to do directly—are you speaking from your own knowledge now?

"A Yes, from my own knowledge.

"Q What was the matter with the car, what was the complaint about the car?

"A As I understand it in taking the car from Yuma to Mr. Deitz's residence the windshield was broken or cracked and the car had to be taken in to Berge Ford in Mesa to be repaired. As I understand, it was a fragment of a stone on the highway that had broken the windshield while Mr. Esmeier was taking it from Yuma to Mesa.

"Q Do I understand that car that is referred to on this order sheet was not the car he was driving at the time of the accident?

"A That is correct.

"Q What was required of Mr. Esmeier in going to Mesa? Wouldn't you ordinarily just make out a repair order or pay Berge's Garage for fixing the windshield?

"A This would be normal, make out a purchase order.

"Q What would be the necessity of Mr. Esmeier going to see Mr. Deitz?

"A If the customer—and here I do not have personal knowledge of this, my Sales Manager at this time was Mr. Bill McGinnis, so I am relating from what Mr. McGinnis told me, that the customer actually when he got a new automobile with a broken windshield was dissatisfied and Mr. Esmeier was going back up to satisfy the customer."

At a later hearing held December 1, 1967, George Foye, secretary-treasurer and office manager of Paul Clark Ford, Inc., testified. He stated that although he had been working at the dealership at the time of the accident and was personally aware of the fact that decedent had made the trip to Mesa because he authorized an expense check of $20.00 toward the trip, he was not personally aware of the reason for the trip. On cross-examination, he testified as follows:

"Q It appears to me at least that the new car was delivered to Mr. Deitz on the 16th, and then on the 19th we have Mr. Esmeier in an accident driving a '65 Comet which is also owned by your company. Have you any way of explaining how he happened to be in the '65 Comet?

"A. The only thing I can say is the way it was explained to me. We had a sales manager at that time by the name of Bill McGinnis. And that is why Clark would be vague on this thing, because McGinnis took care of all the sales transactions. But

the way it was explained to me was that Mr. Esmeier delivered the car to Mr. Deitz. And apparently while he was bringing it up there the windshield or something was cracked, or something happened to this automobile. So he had to go up again the following day. And this is where he took this other car. He had to go up the following day to check out, to pacify this particular customer as to the defects in the automobile.

"Now, this is the way the deal was explained to me."

Mr. Foye stated that the decedent had returned to Yuma with $5.90 verified by expense vouchers which were paid out of the $20.00 expense money, with the difference, $14.10, being charged to the decedent.

Mr. Foye also testified that he had found in the records a billing from Berge Ford for cleaning up the automobile delivered to Mr. Deitz after repair of the windshield, but that under their system of record-keeping it was virtually impossible to find the billing slip for a new windshield and be able to relate this billing slip to the Deitz automobile. Mr. Foye further testified that the used car which the decedent was driving at the time of the accident was not a demonstrator, reemphasizing the testimony of Mr. Clark to the effect that when a salesman drives a used car it is normally for the purpose of showing that car to a customer.

The evidence shows that the former sales manager, Bill McGinnis, had subsequently moved to California and could not be subpoenaed, and that Mr. Deitz had moved and no one had been able to locate him.

Decedent's son testified at the first hearing that his father had discussed with him his reasons for being in the Phoenix area at the time of the accident, in connection with his claim for workmen's compensation. The Commission attorney objected to any testimony relating these conversations with the decedent as being hearsay, and the objection was sustained by the referee. However, Mr. Esmeier did testify that his father had given him names of potential customers, and that he had been able to locate one of those individuals, who was present in the courtroom, and who was the next witness to testify.

Harry Troll, a chef at the Range Restaurant in Glendale, Arizona, which was within five or six blocks of the site of the accident, testified. He said that he had been introduced to decedent by George Bullington, another chef at the Range Restaurant and that he remembered decedent because of a peculiarly crippled right hand. He stated that at his first meeting with the decedent there had been a discussion concerning the sale of an automobile, and that he had been interested in purchasing an automobile, as was George Bullington. The decedent told Mr. Troll that he was going to bring a car out to show to George Bullington on his next trip into town. Mr. Troll testified that George Bullington would have been working on Sunday, March 19. He testified that Mr. Bullington worked the 2:00 p. m. to 10:00 p. m. shift, which was at variance with Mr. Bullington's testimony that he worked the 10:00 p. m. to 6:00 a. m. shift at that time. The question was asked,

"Q Do you know if George was anticipating receiving a car to look at or drive on the weekend of March 19?

"A I do not remember the date but he did talk about receiving a car quite often there."

After a great deal of difficulty, the special administrator was able to locate George Bullington, a chef who follows the "resort route" trade. He works in the northern part of the country during the summer and returns to Phoenix in the wintertime. Mr. Bullington appeared at the second hearing and testified. He stated he had been a chef at the Range Restaurant during the time in question; that he had previously known decedent in Williams, Arizona; and had renewed his acquaintance with him when the decedent came into the Range Restaurant after having delivered a car to Mesa. He stated he had discussed

the possibility of decedent bringing a car to Glendale to show to him and decedent said he would bring one on his next trip to Phoenix. He stated that at no time had he discussed price with decedent; he had merely said he wanted a good, clean, used car. He also testified that although he could not exactly recall the date, he thought he had still been working at the Range Restaurant on March 19, 1967, and that he had worked the "graveyard shift" from 10:00 p. m. until 6:00 a. m. He recalled the conversation previously testified to by Harry Troll, and recalled introducing decedent to Mr. Troll.

The Supreme Court in Muchmore v. Industrial Commission of Arizona, 81 Ariz. 345, 306 P.2d 272 (1957), and again in Malinski v. Industrial Commission, 103 Ariz. 213, 439 P.2d 485 (1968), stated that some of the principles governing the review of Industrial Commission decisions are, (1) the burden of proving that the accident which resulted in injury or death arose out of and in the course of the person's employment rests upon the petitioner; (2) the Commission as trier of facts is not required to disprove it; (3) the legal proof required may be either direct, circumstantial, or facts giving rise to a rebuttable presumption; and (4) evidence adduced will be considered in a light most favorable for sustaining the award.

The Employer's First Report of Injury stated that the decedent's injury occurred when: "Authorized delivery of car to Mesa. Was driving back to Yuma after delivery and was blinded by headlights and ran into a parked truck." This report was prepared by George Foye, secretary-treasurer, and its accuracy was verified by the testimony of Mr. Foye and Mr. Paul Clark at the hearings. Both these men explained the necessity of decedent's March 19 trip to Phoenix to mollify a new car purchaser whose car had been delivered on March 16 with a broken windshield, and Mr. Foye explained that due to the method of record-keeping it was impossible to produce a receipt for repair of the windshield and relate it to any particular automobile.

However, both men corroborated the statement of the decedent on his claim form that he was on an authorized business trip.

Also, both men testified that at that date salesmen for the firm customarily drove new car demonstrators for their personal use, and that when a salesman was driving a used car it was customarily done to show it to a prospective customer.

Decedent named several prospective customers he had called on or intended to call on in the Phoenix area. One, Lilly Lawler, he stated lived at a particular location in Phoenix. She was not at home when he called, he said. This woman was later located at the location named, and stated that on several occasions, though not recently, she had discussed the purchase of a used car from the decedent. She had not seen him on the night of the accident, which corroborates his statement to this effect. The two chefs at the Range Restaurant testified that they had seen decedent during the month of March, and had discussed with him the purchase of used cars. They both testified that on the night they talked with deceased he stated he had delivered a car and was on his way home. Mr. Bullington testified, corroborated by Mr. Troll, that decedent had indicated he would bring a used car to show to Mr. Bullington on his next trip to the Phoenix area. Mr. Bullington stated he was on duty from 10:00 p. m. to 6:00 a. m.

The accident occurred at 9:59 p. m. approximately five blocks from the Range Restaurant, with the decedent headed in the direction of that restaurant.

There is no evidence in the record to controvert the petitioner's circumstantial evidence of the decedent's actions and intent on the date of March 19, 1967.

We note that the referee's report to the Commission contains an editorialized statement of the facts, with notable errors when compared with the record. Whether the Commission's decision may have been due to reliance upon this factual statement or not, it is the opinion of this Court that reasonable men could reach no other con-

clusion from this record than that the decedent was injured by accident arising out of and in the course and scope of his employment.

Award set aside.

STEVENS and CAMERON, JJ., concur.